Filed 10/27/25  Banda-Wash v. Wash CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MARIA S. BANDA-WASH,  Plaintiff, Cross-defendant and Respondent,  v.  JOHN WASH,  Defendant, Cross-complainant and Appellant. | F081204 & F081283  (Super. Ct. No.  15CECG00967)  **OPINION** |
| MARIA S. BANDA-WASH,  Plaintiff and Respondent,  v.  GUY HUTCHINS,  Defendant and Appellant. | F081206 & F081288 |
| MARIA S. BANDA-WASH,  Plaintiff and Respondent,  v.  PEGGY REIMER,  Defendant and Appellant. | F081210 & F081285 |

APPEAL from a judgment of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

John Wash, in pro. per., for Defendant, Cross-complainant and Appellant.

Guy Hutchins, in pro. per., for Defendant and Appellant.

Peggy Reimer, in pro. per., for Defendant and Appellant.

Daniel L. Harralson Law Office and Daniel L. Harralson for Plaintiff, Cross-defendant and Respondent.

-ooOoo-

This is another appeal in the cases between plaintiff Maria Wash and defendant John P. Wash, her former brother-in-law.  (E.g., *Wash v. Banda-Wash* (2025) 108 Cal.App.5th 561.)  Each accuses the other of engaging in a campaign to drive him or her from the 100-acre property in which they hold an undivided one-half interest.  In 2015, Maria filed this tort action against John and two other defendants.  After a court trial, a judgment was entered awarding her approximately $510,000, which included $75,000 in punitive damages against John.  John and the other two defendants were held jointly and severally liable for $100,000 of the judgment.  On appeal, defendants claim the trial court committed numerous factual and legal errors.

First, we conclude substantial evidence supports the trial court's factual findings and the court's credibility findings withstand scrutiny under the applicable standards of review.  Where findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether substantial evidence supports the findings. (*Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 21.) Under this long-established principle, we must reject John's assertions that Maria and her attorney manufactured the evidence supporting her claims.

Second, we conclude defendants' claims of legal error lack merit.  For example, defendants contend Maria's claims for intentional and negligent interference with prospective economic advantage did not state a cause of action because she did not allege

2.

she registered her fictitious business name in accordance with Business and Professions Code section 17910. We conclude the pleading requirement in Business and Professions Code section 17918 regarding the registration of a fictitious business name does not apply to Maria's claims for interference with prospective economic advantage because (1) those claims were not brought under the business's fictitious name and (2) the pleading requirement does not apply to tort actions. As a result, the demurrers based on that requirement were properly overruled.

Also, many of the challenges to the trial court's statement of decision fail because the law does not require a statement of decision to contain the level of detail asserted by defendants. (See Code. Civ. Proc., §§ 632, 634; *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124–1125.)[1]

For these and the reasons set forth below, we affirm the judgment.

## FACTS

Thomas R. Wash and John are the sons of Robert M. Wash (father). Before father died in 2005, he owned approximately 100 acres located at Temperance and Central Avenues in Fresno County (100 acres). Father took care of the 100 acres, paying the bills and making the decisions concerning the farming operations. In 2000, father gave control of the farm to John. John was responsible for paying the bills until father died in 2005.

Plaintiff Maria Banda-Wash was born in Mexico and first met Thomas when he came there in 1977. She came to the United States in January 1986 using a visa obtained to marry Thomas, and they were married in April 1986. When Maria moved to Fresno, she and Thomas lived on the 100 acres and Thomas worked for his father. At the time, the 100 acres had two orchards and a nursery. Maria and Thomas had two sons, Johnny and Martin, who grew up on the property.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

3.

When father died in 2005, the 100 acres was inherited by Thomas and John, with each owning a one-half undivided interest. Maria and Thomas took over paying the bills relating to the 100 acres.

Thomas became very ill with leukemia and, in December 2006, Maria took over managing the farm and paying the bills. Jessica Wash, John's daughter-in-law, assisted with keeping the books. Because Thomas was too sick to work, Maria farmed the 100 acres with her son and her brother. At that time, John did not work the farm. In 2007-2008, all the money generated by the farm went to paying bills and taking care of liens. That remained the case until 2010, when the farm started making a profit.

*First Lawsuit*

The litigation between John and Maria began in March 2009 when Thomas and Maria filed a complaint seeking the dissolution of a general partnership named "Wash and Wash Partnership." The partnership had been formed in 1998 by John, Thomas, and Maria, and the initial contributions included two 20-acre parcels located on East Central Avenue (the 40 acres). Thomas and Maria's complaint sought dissolution of the partnership, an accounting of its affairs, and an in-kind partition of the 40 acres into two 20-acre parcels.

John filed a cross-complaint seeking dissolution of the partnership and damages for waste. In addition, the cross-complaint significantly expanded the scope of the lawsuit by seeking partition of the 100 acres. The Fresno County Superior Court assigned the action case No. 09CECG00933. In this opinion, we refer to it as the "2009 Partition Action." The 100 acres contained the residence of Thomas and Maria and the separate residence of John. The residences were served by the same driveway. John's residence is north of the driveway. The other residence is south of the driveway and further west from Temperance Avenue.

The 100 acres contains groundwater wells and two pumps. The residences and nursery for Maria's palm tree business were served by a pump powered by a six-

4.

horsepower electric motor. The pump for the property's irrigation system was driven by a diesel engine.

*The Settlement Agreement*

In August 2010, John, Thomas, and Maria participated in a mediation and reached a settlement agreement. The parties, their attorneys, and the mediator signed the four-page settlement agreement. The agreement resolved the issue of partitioning the 40 acres by providing that Thomas and Maria would purchase John's interest in the property.

The partitioning of the 100 acres was addressed by dividing it into three parcels, with John receiving the northern most parcel with a lot line running from Temperance Avenue along John's side of the driveway to the western boundary of the 100 acres. John also was to receive a recorded easement for use of the driveway. Thomas and Maria were to receive a parcel of the same size immediately south of John's parcel and a right of first refusal to purchase the third and southernmost parcel.

The settlement agreement also addressed the palm tree business operated by Thomas and Maria, which extended onto two to three acres that would be part of John's parcel. Those acres were near the residence occupied by Thomas and Maria. John agreed to rent those acres to Thomas and Maria at a dollar per year for 10 years, with John taking ownership of any trees remaining on those acres after the lease period. The business occupied more area than those two to three acres, which were located north of the driveway. At trial, Maria testified the nursery and some Sago palms were located south of the driveway.

The settlement agreement addressed the parties' water issues by authorizing John to place a well at his sole expense at the back of the two to three acres leased to Thomas and Maria. John was given one year after receiving the payment for his interest in the 40 acres to have the well installed. During that one-year period before the well was operational, Thomas and Maria agreed to allow water to John's home and to allow him to irrigate his portion of the 100 acres in a culturally appropriate fashion. John agreed to

5.

pay 25 percent of the monthly diesel fuel bill to operate the irrigation pump. A new well was not installed, which generated subsequent disputes over access to the existing wells.

Thomas died in November 2011 at age 59. In February 2012, the purchase of John's interest in the 40 acres was finalized and the purchase price of $270,000 was tendered to John.

*Further Disputes*

After Thomas's death and the completion of the sale of John's interest in the 40 acres to Maria, multiple issues arose between John and Maria and the litigation between them mushroomed.[2] The issues included, but were not limited to, access to portions of the co-owned 100 acres, use of water from the property's wells, Maria's operation of the nursery and palm tree business on the property, and damage to vehicles and to other property.

One dispute involved the cost of watering the Mandarins on the property. In 2012, Maria took care of the watering. In 2013, John took over this task and he used the electric pump from 2013 through 2015. The electricity used by the pump was billed to Maria and she claimed John was liable for converting electricity to his own use.

Disputes also arose in connection with Maria's customers coming to the 100 acres to purchase palm trees. In March 2013, John placed a large shipping container across the driveway leading to the portion of the 100 acres where Maria operated her business. John also placed a no trespassing sign on the container. The placement of the container and other acts by John, Peggy and Guy that interfered with Maria's business are described in part VII.B. of this opinion.

---

[2]    At least 10 more lawsuits were filed, which the Fresno County Superior Court assigned case nos. Nos. 12CEFL06629, 13CECG00057, 13CECG00774, 13CECG03732, 13CECG03846, 14CECG01236, 15CECG00967, 15CECG01407, 16CECG01668 and 17CECG00648. The lawsuits have generated 30 writ proceedings and appeals in this court, all of which were filed by John.

John hired a surveyor to do the lot line adjustment splitting the 100 acres in accordance with the settlement agreement. A dispute arose over the location of the lot line in relation to the driveway, and John fired the surveyor. Maria testified that there came a point where John told her that he was not going to split anything with her, that his father had left everything to him, that Maria was a squatter and needed to go back where she came from, and that if she did not leave he was going to send her to see her husband in hell.

On July 20, 2013, John made threats to Maria by telling her "you're gone" and "you're history." A further threat was made by John on August 15, 2013; it constituted an assault and is described below in part III.B. of this opinion.

The trial court also found John committed two batteries against Maria. Those incidents occurred on October 22, 2013, and December 1, 2013, and are described below in part IV.B. of this opinion.

*The Restraining Order*

In December 2013, Maria filed a request for a civil harassment restraining order against John. The Fresno County Superior Court assigned it case No. 13CECG03846. The trial court issued a temporary civil harassment restraining order against John. In March 2014, after a two-day trial, the court issued a three-year restraining order protecting Maria and her sons. The order required John to stay at least 200 yards away from the protected persons and Maria's home, workplace and vehicle. The court also awarded Maria attorney fees and costs totaling $16,814. This court affirmed the restraining order and the award of fees and costs. (*Maria Banda v. John Wash* (Feb. 3,

7.

2016, F069417) [nonpub. opn.].)  In 2017, the trial court renewed the restraining order for five years.[3]

*Enforcing the Settlement Agreement*

In January 2015, Maria filed a motion pursuant to section 664.6 to enforce the August 2010 settlement agreement.  In February 2015, the trial court granted the motion and entered a judgment that incorporated the settlement agreement.  In September 2017, this court affirmed the judgment.  (*Maria Wash v. John Wash* (Sep. 12, 2017, F071135) [nonpub. opn.].)  Despite the entry of a judgment, implementing the terms addressing the partition of the 100 acres remains a source of dispute between the parties.[4]

---

**3**    Case No. 13CECG03846 has generated three other opinions by this court and the denial of two writ petitions.  (See *Maria Banda v. John Wash* (Feb. 19, 2020, F076666) [nonpub. opn. vacating order renewing Maria's restraining order and directing entry of nunc pro tunc order continuing hearing of renewal request until December 13, 2017]; *Maria Banda v. John Wash* (Sept. 30, 2020, F077727) [nonpub. opn. reversing order denying John's motion to tax costs and directing trial court to strike the memorandum of costs claiming a $60 filing fee]; *Maria Banda v. John Wash* (Dec. 1, 2020, F076986) [nonpub. opn. vacating order renewing Maria's restraining order and remanding for further proceedings].)  The writ petitions were assigned case Nos. F076372 and F084019.

**4**    As of the date of this opinion, John filed six appeals and three writ petitions in the 2009 Partition Action.  John voluntarily dismissed one appeal (case No. F070262); we issued decisions in three appeals (*Maria Wash v. John Wash* (Sept. 12, 2017, F071135) [nonpub. opn. affirming judgment entered pursuant to Maria's § 664.6 motion]; *Maria Wash v. John Wash* (Mar. 11, 2021, F077486) [nonpub. opn. affirming order awarding Maria attorney fees]; *Maria Wash v. John Wash* (Jul. 24, 2023, F080399) [nonpub. opn. affirming in part and reversing in part on order addressing partition of the 100 acres and Maria's entitlement to attorney fees]); and two appeals are pending (case Nos. F084442 & F084443).  Two of John's writ petitions were denied (case Nos. F070440 & F082085) and one was granted (*John Wash v. Superior Court* (Feb. 3, 2025, F086934) [nonpub. opn. directing trial court to grant John's peremptory challenge to trial judge]).

8.

## PROCEEDINGS

In March 2015, Maria filed a complaint against John, Peggy Reimer, Guy Hutchins (collectively, defendants) and John's wife.[5] Peggy is John's sister-in-law. She was not employed by John but was frequently at the 100 acres. Some of Peggy's actions that were the subject of Maria's tort claims were taken at John's direction.

Guy and John have known each other for many years. In March 2014, Guy moved onto the 100 acres to help John with the pump due to the restraining order issued against John. Guy provided help on the property in exchange for a place to live. He assisted with watering and maintaining equipment. Guy left in mid-2016.

Maria filed the complaint as an individual and alleged she was doing business in Fresno County as Sago Rey Trading. The complaint contained causes of action for assault; battery; negligence; intentional interference with prospective economic advantage; negligent interference with prospective economic advantage; conversion; intentional infliction of emotional distress; negligent infliction of emotional distress; and property damages from vandalism. The complaint also alleged defendants were guilty of oppression and malice and requested punitive damages.

Defendants filed demurrers to the complaint. Among other things, the demurrers asserted the claims for interference with prospective economic advantage failed to state a cause of action because Maria lacked the capacity to sue on behalf of Sago Rey Trading because she did not allege the fictitious business name was registered in Fresno County pursuant to Business and Professions Code sections 17900 through 17918. In May 2015, the trial court overruled the demurrers on all grounds.

In June 2015, John filed an answer and a cross-complaint against Maria, individually and as trustee of the Thomas R. Wash and Maria S. Banda Revocable Trust.

---

[5] John and his wife separated in 2014 and she moved off the property. The trial court found in favor of John's wife on all causes of action against her and she is not a party to this appeal.

9.

At the time of trial, John's operative pleading was the second amended cross-complaint he filed in February 2016. It included claims for misapplication of money and property, conversion, interference with economic relationship, infliction of emotional distress, ejectment and withholding real property, and negligence. John requested an accounting, injunctive relief, damages, and punitive damages.

## The Court Trial

On September 26, 2018, the court trial commenced. The 29-day trial concluded on February 13, 2019. On that date, John requested a dismissal of his cross-complaint without prejudice. Maria's counsel objected to a dismissal without prejudice and was ready to proceed with evidence on the cross-complaint. The trial court ordered the request for dismissal stricken and, when John stated he was not going to proceed with his evidence, ordered the cross-complaint dismissed with prejudice.

### Trial Court's Ruling

In December 2019, after submission of closing briefs, the trial court issued a 20-page proposed statement of decision. It contained (1) historical background information about the parties and the property; (2) general factual findings; (3) a description of, and further findings on, each cause of action alleged in Maria's complaint; (4) findings on liability and damages; (5) the court's analysis of John's cross-complaint; and (6) a conclusion advising the parties of the procedural steps for submitting objections to the proposed statement of decision and the consequences of failing to submit objections. (See §§ 632, 634; Cal. Rules of Court, rule 3.1590.)

In January 2020, John filed a 61-page objection to the proposed decision and Peggy filed a 33-page objection. On January 13, 2020, the trial court filed a 21-page statement of decision, which stated it had read and considered the objections of John and Peggy and explained that it was not required to discuss all factual and legal issues raised by the parties but could state its findings on ultimate facts rather than the underlying evidentiary facts. The court found for Maria and against John on most of the causes of

10.

action and also found Peggy and Guy were liable for interfering with Maria's business. The decision stated John's cross-complaint was dismissed with prejudice. Maria's counsel was directed to submit a judgment within seven days of service of the statement of decision.

*Judgment and Appeal*

On January 28, 2020, the trial court signed and filed the judgment prepared by Maria's counsel. The damages section of the judgment held John liable to Maria for (1) $322,122.85 in noneconomic and economic damages for assault, battery, intentional infliction of emotional distress, and negligence; (2) $75,000 in punitive damages; and (3) $12,550 for conversion and property damage. It also awarded Maria $100,000 in damages (1) against John for intentional and negligent interference with prospective economic advantage and (2) against Peggy and Guy for their negligent interference with prospective economic advantage.[6] John, Peggy and Guy were held jointly and severally liable to Maria for the $100,000 in damages.

On May 19, 2020, John, Peggy and Guy filed separate notices of appeal from the January 28, 2020 judgment. The next day, an amended judgment was filed, which again incorporated the final statement of decision issued on January 13, 2020. It appears the only change to the judgment was to refer to Maria as "MARIA S. BANDA-WASH." Rather than filing amended notices of appeal, John, Peggy and Guy each filed a new appeal from the amended judgment. In July 2020, this court consolidated the six appeals under case No. F081204.

---

[6] The section of the judgment labeled "PLAINTIFF'S COMPLAINT," like the statement of decision, found in favor of Maria and against Peggy for both intentional and negligent interference with prospective economic advantage. In contrast, the damages section of the judgment held Peggy liable for damages only on the cause of action for negligent interference with prospective economic advantage. Maria's respondent's brief offered no explanation for why the judgment was prepared in this manner.

11.

In January 2024, this court denied the 15th applications for an extension of time to file opening briefs by John and Peggy. John filed a petition for writ of mandate with the California Supreme Court seeking to vacate the orders and requesting an immediate stay. The Supreme Court assigned the petition case No. S283455 and denied it on January 31, 2024. After this court issued the notice required by California Rules of Court, rule 8.220(a)(1), the defendants filed their opening briefs in March 2024. Maria filed her respondent's brief in November 2024, after receiving five extensions. Defendants' reply briefs were filed about six months later.

## DISCUSSION

I.      CAPACITY TO SUE AND FICTITIOUS BUSINESS NAME REGISTRATION

Defendants contend the trial court abused its discretion by overruling their demurrers to the claims for intentional and negligent interference with prospective economic advantage, the fourth and fifth causes of action in Maria's complaint.

A.      Standard of Review

Whether a pleading has stated facts sufficient to constitute a cause of action recognized by California law presents a question of law subject to independent review by appellate courts. (§ 430.10, subd. (e); *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) Accordingly, when reviewing a ruling on a demurrer, "appellate courts must independently decide questions of law without deference to the legal conclusions of either the pleader or the trial court." (*Villery v. Department of Corrections & Rehabilitation* (2016) 246 Cal.App.4th 407, 413.) The interpretation of a statute also presents a question of law subject to independent review on appeal. (*Davis Boat Manufacturing-Nordic, Inc. v. Smith* (2023) 95 Cal.App.5th 660, 672.) Consequently, in this case, whether Business and Professions Code section 17918 applied to Maria's claims and, as a result, whether she was required to plead compliance with the fictitious business name registration requirement to state a cause of action are questions of law subject to our independent review.

12.

B.      Statutory Text

Business and Professions Code section 17910 provides in part:  "Every person who regularly transacts business in this state for profit under a fictitious business name shall ... [¶] (a) File a fictitious business name statement in accordance with this chapter not later than 40 days from the time the registrant commences to transact such business."  Some consequences of the failure to register are set forth in Business and Professions Code section 17918, which provides:  "No person transacting business under a fictitious business name contrary to the provisions of this chapter … may maintain any action upon or on account of any contract made, or transaction had, in the fictitious business name in any court of this state until the fictitious business name statement has been executed, filed, and published as required by this chapter."  The purpose of this provision is to ensure that those who do business with persons operating under a fictitious name will know the true identities of the individuals with whom they are dealing or giving credit. (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 1001, fn. 8.)

This goal of disclosing the true identities of those using fictitious business names is reflected in the Law Revision Commission Comments to Business and Professions Code section 17918, which stated that "an individual businessman who also uses a fictitious business name is not precluded from maintaining an action arising out of a business transaction consummated *under his own name*."  (Recommendation and Study Relating to Fictitious Business Names (Oct 1969) 9 Cal. Law Revision Com. Rep. (1969) p. 621, italics added.)  When a plaintiff maintains a lawsuit under his or her own name, the plaintiff's identity is not hidden by the fictitious business name.

C.      Application of the Statute

The first reason Business and Professions Code section 17918's bar does not apply to Maria's fourth and fifth causes of action is that they are brought in her name, not in the fictitious name of the business.  The caption of the complaint identifies "MARIA S. BANDA-WASH, an individual" as the sole plaintiff.  The first paragraph of the

13.

complaint states: "Plaintiff, MARIA S. BANDA-WASH, is, and at all time herein mentioned was, an individual and resident of Fresno County, California and doing business in Fresno County, California, as S[a]go Rey Trading." The allegations in the causes of action alleging interference with prospective economic advantage contain many references to "Plaintiff" (i.e., Maria) and "Plaintiff's business."

Consequently, the contents of the complaint plainly show the lawsuit was maintained by Maria in her own name and not "in the fictitious business name." (Bus. & Prof. Code, § 17918.) Sago Rey Trading was not a named plaintiff. The references to Sago Rey Trading in the complaint are descriptive and do not mean the action was maintained that name. The purpose of Business and Professions Code section 17918 has not been thwarted in this case because defendants know the true identity of the individual who is suing them. (See *Hydrotech Systems, Ltd. v. Oasis Waterpark*, *supra*, 52 Cal.3d at p. 1001, fn. 8.) In other words, Maria is not hiding behind a fictitious name.

The second reason Business and Professions Code section 17918's bar does not apply to Maria's fourth and fifth causes of action is that tort claims fall outside the scope of the statute. A treatise addressed this point by stating: "Pursuant to Business and Professions Code § 17918, the barrier to suit applies to 'any action upon or on account of any contract made, or transaction had, in the fictitious business name.' As a result, the prohibition on suit does not apply to causes of action in tort unrelated to a contract made or transaction had in the fictitious business name. The term 'transaction' is used to reflect something of a mutual nature and does not include torts." (3 Schwing & Carr, Cal. Affirmative Defenses (2024) § 39:36, pp. 74–75, fns. omitted; see *American Alternative Energy Partners II v. Windridge, Inc.* (1996) 42 Cal.App.4th 551, 562 [Bus. & Prof. Code, § 17918's "penalty does not apply to tort actions brought by the fictitious name business entity"]; *Grant v. Weatherholt* (1954) 123 Cal.App.2d 34, 43–44 [predecessor statute did not apply to tort actions].)

14.

In accordance with these authorities, our Supreme Court has stated that Business and Professions Code section 17918's "purpose is not served by extending its protection to one who committed a tort against a fictitiously named business." (*Hydrotech Systems, Ltd. v. Oasis Waterpark, supra,* 52 Cal.3d at p. 1001, fn. 8.) Further, defendants have cited, and we have located, no authority concluding the specific tort claims of interference with prospective economic advantage are covered by Business and Professions Code section 17918. (Cf. *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 479 [requirement for a fictitious business name statement applies to a motion to compel arbitration, which is essentially a suit in equity to compel specific performance of a contract].) Restated in the statute's language, a prospective economic advantage is not a "contract made, or transaction had." (Bus. & Prof. Code, § 17918.)

Consequently, we conclude Maria's tort claims for negligent and intentional interference with prospective economic advantage are not barred by Business and Professions Code section 17918. Therefore, defendants' demurrers to Maria's fourth and fifth causes of action were properly overruled.

II. STANDARD OF REVIEW FOR JUDGMENT AFTER COURT TRIAL

A. Questions of Law and Questions of Fact

On appeal from a judgment based on a statement of decision following a court trial, appellate courts independently review the trial court's determination of questions of law, which include questions of statutory construction. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492.) In comparison, the trial court's express and implied findings of fact are reviewed under the substantial evidence standard. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.) When applying the substantial evidence standard, appellate courts view the evidence in the light most favorable to the prevailing party, drawing every reasonable inference and resolving all conflicts in the evidence in support of the judgment. (*Ibid.*) Evidence is "substantial" for purposes of this standard of review if it is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Ibid.*)

15.

Over 40 years ago, this court stated: " 'With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is ... substantial evidence to support them.' " (*Montebello Rose Co. v. Agricultural Labor Relations Bd.*, *supra*, 119 Cal.App.3d at p. 21.)

  B. <u>Credibility Findings</u>

  Many decisions state appellate courts " 'are bound by the trial court's credibility determinations.' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94, quoting *Estate of Young* (2008) 160 Cal.App.4th 62, 76; accord, *Pulse Technology Consulting Group, Inc. v. Skowron & Bunning LLP* (2025) 108 Cal.App.5th 824, 833; *Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1124; *Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.) A conflicting line of cases conclude a trial court's credibility determination are subject to scrutiny by an appellate court. For example, Division Three of the Fourth District stated the trial court *usually* determines the credibility of witnesses, but appellate courts "are not bound by credibility determinations that are arbitrary or unreasonable." (*Shapell SoCal Rental Properties, LLC v. Chico's FAS, Inc.* (2022) 85 Cal.App.5th 198, 218 [witness testimony was presented by declaration]; see *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1364, fn. 9 ["we can conceive of no rational basis for the court to reject Cave's testimony and do not feel compelled to disregard it"]; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [court may not arbitrarily reject uncontradicted evidence or do so without a rational basis].)

  We join those cases adopting the rule of law that appellate courts are not bound by trial court's credibility determinations. As a result, we take the next analytical step and identify the standard of review applicable to express and implied credibility findings. This step would not have been necessary if we had concluded we were bound by a trial

court's credibility determinations. We conclude different standards of review apply, depending on whether the testimony was found credible or not credible.

When a trial court expressly or impliedly finds some or all of a witness's testimony *is credible*, the appellate court defers to that credibility finding unless the testimony is incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds. (*TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1106; *Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.)

In comparison, when a trial court expressly or impliedly finds all or part of a witness's testimony *is not credible*, appellate courts defer to that finding "if there [wa]s any rational ground for" the trial court to disbelieve the witness. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) Under this standard, a trial court's rejection of a witness's uncontradicted testimony will be upheld on appeal so long as the rejection was not arbitrary—that is, irrational. (*Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 171.) Rational grounds for disbelieving a witness include the factors listed in Evidence Code section 780, such as the witness's interest in the matter. (Evid. Code, § 780, subd. (f); see *Pierce v. Wright* (1953) 117 Cal.App.2d 718, 723.) Applying the any-rational-ground-for-disbelief standard, the court in *Feduniak* refused to infer the trial court impliedly found a witness's testimony was not credible because it could "conceive of no rational basis for the court to" determine the testimony as not credible. (*Feduniak v. California Coastal Com.*, *supra*, 148 Cal.App.4th at p. 1364, fn. 9.)

In summary, we conclude we are not bound by the credibility findings expressed or implied in a trial court's statement of decision. Those credibility findings are, however, entitled to a high degree of deference under the standards of review described above. As a result of this deference, it is very difficult for the appellants in this case to convince us that a credibility finding of the trial court was wrong.

III.    ASSAULT CAUSE OF ACTION

Maria's March 2015 complaint alleged that from "about March 24, 2013, and continuing to the present," the defendants knowingly and willfully followed or stalked her, made harassing telephone calls to her, pointed a handgun at her, made threats of physical harm to her, her family, and her employees, and damaged her personal property. The complaint also alleged defendants intended to place Maria in apprehension of harmful contact and great bodily harm and she was, in fact, apprehensive of harmful contact.

A.    Elements

The tort of "assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." (*Lowry v. Standard Oil Co. of California* (1944) 63 Cal.App.2d 1, 7 (*Lowry*).)  Because the cause of action seeks to protect individuals from fear (i.e., apprehension), "[t]he tort of assault is complete when the anticipation of harm occurs." (*Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 232.)

"The essential elements of a cause of action for assault are: (1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." (*So v. Shin* (2013) 212 Cal.App.4th 652, 668–669.)  "[A] civil action for assault will lie where the defendant has only the apparent present ability to inflict the threatened harm, providing the victim is put in fear of personal harm.  For example, the threatening of another with an unloaded gun constitutes an assault unless the plaintiff knows in fact that the gun is not loaded." (6A Cal.Jur.3d (2019) Assault and Other Willful Torts, § 28, p. 69, fn. omitted; see *Lowry*, *supra*, 63 Cal.App.2d at p. 7.)  In

18.

cases of assault, "mental suffering will frequently constitute the principal element of damages." (*State Rubbish etc. Assn. v. Siliznoff* (1952) 38 Cal.2d 330, 338.)

"Witkin notes the general rule that 'while apprehension of that contact is the basis of assault [citation], [m]ere words, however threatening, will not amount to an assault. [Citations.]' (5 Witkin, Summary of Cal. Law [(11th ed. 2017)] Torts, § [454], [p. 672].)" (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1604.) Similarly, the Restatement (Second) of Torts provides: "Words do not make the actor liable for assault unless together with other acts or circumstances they put the other in reasonable apprehension of an imminent harmful or offensive contact with his person." (Rest.2d Torts, § 31.)

John's reply brief suggests the trial court committed legal error because the statement of decision altered the elements set forth in *So v. Shin* and, although it cited CACI No. 1301, the statement of decision did not include any portion of the instruction's text. We reject this suggestion. We have reviewed *So v. Shin*, *supra*, 212 Cal.App.4th 652; CACI No. 1301 (Assault—Essential Factual Elements); other cases discussing the tort of assault; and secondary authorities. (E.g. *Lowry*, *supra*, 63 Cal.App.2d 1; *Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 890; 5 Witkin, *supra*, Torts, §§ 452–456, pp. 671–674; 6A Cal.Jur.3d, *supra*, Assault and Other Willful Torts, §§ 26–29, pp. 65–71.) We conclude the trial court accurately stated the essential elements that must be proven to establish liability for the tort of assault in the circumstances of this case. The trial court omitted language describing an assault based on an "intent to cause harmful or offensive contact" and retained the language for the type of assault where the defendant "threatened to touch plaintiff in a harmful or offensive manner." (*So v. Shin*, *supra*, at p. 668.) The omission of the language describing one type of assault was appropriate for this case because John's conduct involved a threat of contact, not an act made with the intent to cause contact. Consequently, we conclude the trial court did not commit legal error in stating the elements needed to prove the tort of assault.

19.

B.   Factual Findings

After setting forth the elements of assault, the trial court's statement of decision included the following factual findings:

"[Maria] asserts that on July 20, 2013 JOHN made verbal threats towards her including 'you're gone' and 'you're history.'  She also testified that on or about August 15, 2013 around 11:00 p.m. JOHN was riding his quad around her residence.  MARIA was just finishing watering her palm trees.  JOHN frequently rode his quad around [Maria's] residence at night.  JOHN pulled up to her and pulled out what appeared to be a gun from his pants and pointed it at her.  [Maria] thought she was going to die.  He then rode away laughing.  Although JOHN denies that he had a gun the court finds MARIA's testimony to be credible and finds the evidence sufficient to establish that JOHN assaulted MARIA."

The part of the statement of decision discussing Maria's claim for punitive damages against John found:  "The evidence shows that JOHN intentionally engaged in malicious and despicable conduct to accomplish his stated goal [of running her off the property]," which included "pointing a gun at her."

During the trial, Maria testified she was watering palms on August 15, 2013.  At around 11:00 p.m., she went to turn the water off and lock the gate before she went to bed at night.  She stated:  "So the gate was still open and John came in his quad.  I was right there next to the road turning the faucet off and he stopped right there laughing.  He got a little gun out of his, you know -- I don't know if it was his pants or something.  He point it to me, and I told him if he --."  Peggy interrupted to ask her to speak louder and the court said:  "All right.  What did he get out of his pocket?"  Maria stated:  "He got a little gun.  I don't know if it was turning to it.  It was dark.  I couldn't see it but it looks like a gun and pointed to me and laughing[.]"  When asked how she felt, Maria said:  "I thought it's going to be over.  I thought he's going to kill me."  In response to John's gesture and laughing, Maria "told him if he kills me I got my kids and it's a trust, and if he kills me it's not going to do anything [for] him because the property is still going to go to my kids."  After John drove off, Maria called the sheriff's department.  Maria also testified

20.

that, three days later, she heard gunshots over by John's house. The testimony about gunshots supports the inference that John had access to a gun.

We conclude the findings of an assault are supported by Maria's testimony and her testimony constitutes substantial evidence. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness, even a party, may alone constitute substantial evidence].) Furthermore, we accept the trial court's express finding that Maria's testimony was credible because that testimony was not incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds. (*TRC Operating Co., Inc. v. Chevron USA, Inc.*, *supra*, 102 Cal.App.5th at p. 1106.)

### C. John's Claims of Trial Court Error

#### 1. *John's Opening Brief*

Part IV.C. of John's opening brief contends the trial court erred by finding in Maria's favor on the assault cause of action. John contends the awards on the assault and three other causes of action are "not supported by any substantial evidence; therefore, must be reversed as a prejudicial miscarriage of justice, which would not have occurred but for the court's erroneous findings of fact and/or law in the statement of decision and/or judgments." Part IV.C. did not include any citations to the evidence in the record, did not discuss or analyze the evidence, but simply asserted the court's findings were not supported by substantial evidence.

When an appellant contends the trial court's factual findings lack sufficient evidentiary support, the appellate court starts with the presumption that the record contains evidence to sustain every finding of fact. (*LA Investments, LLC v. Spix* (2022) 75 Cal.App.5th 1044, 1061.) To overcome this presumption, "[a] party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) "When [an] appellant's opening brief states only favorable facts, ignoring evidence favorable to respondent, the

21.

appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain every finding of fact." (*LA Investments, LLC v. Spix*, *supra*, at p. 1061.)

Maria contends John's opening brief (1) failed to state facts in the light most favorable to the judgment and (2) reargued the facts viewing the evidence in a light most favorable to him. Maria requests this court to deem "all the issues raised in this appeal waived for failure to present [the facts] properly [*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881]."

We conclude that John, in challenging the sufficiency of the evidence to support the findings on the assault claim, failed to "set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly*, *supra*, 177 Cal.App.4th at p. 218.) "Because [John] has failed in his obligations concerning the discussion and analysis of a substantial evidence issue, we deem the issue waived."[7] (*Ibid.*) This conclusion is an alternative ground for rejecting John's challenge to the sufficiency of the evidence. The first ground was the existence of substantial evidence in the record—namely, Maria's testimony—to support the trial court's findings of an assault. (See pt. III.B., *ante*.)

### 2. John's Reply Brief

Next, we consider John's reply brief and the arguments it contains. The reply brief responds to Maria's waiver argument by raising several points and providing a more detailed discussion of the asserted flaws in the trial court's analysis of the assault cause of action. We conclude these arguments fail to establish reversible error.

---

[7]  We reject Maria's argument that *all* issues should be deemed waived by the opening briefs approach to the evidence. John's approach forfeits only his claims regarding the sufficiency of the evidence to support the court's findings. It does not forfeit claims of legal error.

22.

First, appellate courts are not required to consider an issue raised for the first time in a reply brief. (*Herrera v. Doctors Medical Center of Modesto* (2021) 67 Cal.App.5th 538, 548 [" 'It is elementary that points raised for the first time in a reply brief are not considered by the court' "].) Accordingly, we reject John's arguments addressing the assault cause of action that are raised for the first time on appeal in John's reply brief. One reason for our rejection is the passage of 1,394 days (nearly four years) between the filing of the notice of appeal (May 19, 2020) and the filing of John's opening brief (March 13, 2024). This was sufficient time for a self-represented litigant who has briefed several appeals to learn how to properly present a challenge to the sufficiency of the evidence.

A second, independent basis for rejecting the arguments raised in the reply brief is that, as explained below, they lack merit.

### 3. Level of Detail in the Statement of Decision

One of John's challenges asserts his opening brief provided a complete, accurate, and fair summary of the significant facts necessary for review and showed how the statement of decision "ignored those its erroneous citations and/or omissions in the trial evidence and testimonies and/or created its own adulterated version to support its 'ultimate' findings and/or insufficiency of evidence." This argument and others suggest the trial court's decision was not detailed enough in its findings regarding the assault claim.

"A statement of decision need not address all the legal and factual issues raised by the parties." (*Muzquiz v. City of Emeryville*, *supra*, 79 Cal.App.4th at pp. 1124–1125; § 632.) The "statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380; § 632.) In accordance with these principles, a trial court is not required "to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence."

(*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67; *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118 [the trial court is not required to make an express factual finding on every controverted factual matter where the statement of decision sufficiently disposes of all the basic issues].) Based on these principles and the express findings of the court, which are quoted above, we conclude the statement of decision sufficiently discloses the trial court's determination as to the ultimate facts on the assault cause of action.

### 4. The Evidence About a Gun

Another of John's arguments about Maria's failure to prove her allegations suggests that Maria's testimony about John pointing a gun at her was insufficient to prove he had a gun and pointed it at her in a threatening manner.

John's testimony that he did not have a gun, the sheriff's deputy's inability to corroborate Maria's claim when he investigated the incident, and Maria's lack of certainty about whether the object pointed at her was a gun did not require the court to find John did not point a gun. In other words, the trial court, as the trier of fact, could reasonably infer it was more likely than not that John possessed a gun and used it on August 15, 2013, to threaten Maria based on (1) Maria's description of his physical actions immediately before he pointed the object at her, (2) Maria's perception that he had a gun, (3) her testimony about hearing gunshots three days later that, and (4) John's stated goal of running her off the property. Under the deferential substantial evidence standard of review, "[t]he trier of fact is the sole arbiter of all conflicts in the evidence, conflicting interpretations thereof, and *conflicting inferences* which reasonably may be drawn therefrom[.]" (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099; see *County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 72 ["substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom"].) Also, under the more deferential standard of review applied to the implied credibility determinations (see pt. II.B., *ante*), John has not established the court erred in disbelieving his testimony.

John also argues that Maria failed to prove the elements of assault because she did not testify John was threatening her. We conclude a plaintiff is not required to specifically use the word "threat" or its variants in his or her testimony to prove the defendant "threatened to touch plaintiff in a harmful or offensive manner" (*So v. Shin*, *supra*, 212 Cal.App.4th at p. 668), particularly when a gun is pointed at the plaintiff. Here, Maria's description of John's conduct and her testimony stating "I thought he's going to kill me" provides a sufficient basis for the trial court to find John threatened to touch her in a harmful manner.

### 5.     *Words Alone Are Not an Assault*

John quotes cases stating that mere words, however threatening, do not amount to an assault. He challenges the trial court's statement that Maria "asserts that on July 20, 2013 JOHN made verbal threats towards her including 'you're gone' and 'you're history' " as an inadequate basis for finding he assaulted Maria. As we interpret the statement of decision, the trial court did not conclude the verbal threats on July 20, 2013, were an assault. Rather, the court described Maria's testimony about the threats to provide context for John's subsequent behavior and the effect it would have on Maria. Because the court did not determine John's spoken words, standing alone, constituted an assault, we reject this claim of error.

John also argues his " 'laughing' is far less than the … offensive unactionable words found in *Plotnik* [*v. Meihaus*], *supra*[, 208 Cal.App.4th 1590]." This argument fails for the same reason—the trial court did not find John's laughing, standing alone, constituted an assault.

### 6.     *The Element of No Consent*

John's reply brief contends the trial court did not consider whether Maria met her burden of proof for the third element of assault—the absence of the victim's consent.[8]

---

**8**      An appellant can contend, without much difficulty, that a trial court failed to *consider* or evaluate a matter. (See *Gonzales v. Interinsurance Exchange* (1978) 84

John asserts there was no finding and, moreover, Maria's testimony about how she actively engaged John in a verbal discussion shows her consent to the alleged tortious act. The absence of an explicit finding on the element of consent does not constitute reversible error because (1) John's reply brief does not cite to anything in the record showing he brought this omission to the attention of the trial court and (2) our own review of John's 61-page objection to the proposed statement of decision did not locate the omission among the points he raised.

In summary, we conclude John has failed to demonstrate the trial court committed legal or factual error when it determined he was liable for assaulting Maria. Because the court determined (1) no evidence was submitted as to Peggy on the assault claim and (2) the evidence was insufficient to establish that Guy committed an assault, we need not discuss those parts of Maria's assault cause of action.

IV.    BATTERY CAUSE OF ACTION

Maria's complaint alleged that (1) on October 22, 2013, John tampered with a gate located on the driveway leading to her residence and business by removing the hinges and propping up the gate to make it appear the gate was open and stable; (2) John was aware Maria used the gate daily and would close and lock it at the end of each day; (3) John intended to place her in great danger of a harmful contact; (4) the gate fell on Maria when she attempted to close it, causing severe and permanent physical and emotional injuries; and (5) at no time did Maria consent to John's actions.

Cal.App.3d 58, 63 ["consider" refers to the mental process of weighing of evidence].) While easy to assert, it is difficult for an appellant to demonstrate a court did not mentally evaluate a particular point, argument, or piece of evidence before issuing its statement of decision. To successfully make this challenge, an appellant must overcome the presumption of correctness and the doctrine of implied findings. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137.)

A.      Elements

"Harmful or offensive contact, intentionally done, is the essence of battery (Rest.2d, Torts § 18)."  (5 Witkin, *supra,* (11th ed. 2017) Torts, § 454, p. 672.)  "The essential elements of a cause of action for battery are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching.  (CACI No. 1300; see *Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, 645 .…)"  (*So v. Shin*, *supra*, 212 Cal.App.4th at p. 669.)  "[T]he tort of battery generally is not limited to direct body-to-body contact."  (*Mount Vernon Fire Ins. Co. v. Busby* (2013) 219 Cal.App.4th 876, 881.)

The trial court relied on *So v. Shin* and CACI No. 1300 in setting forth the elements Maria had to prove to prevail on her battery cause of action.  We conclude the court correctly identified the elements of the tort of battery.

B.      Factual Findings

In the statement of decision, the trial court determined Maria met her burden of proving a battery was committed by John on October 22, 2013 and December 1, 2023.  The court found:  "On October 22, 2013, JOHN told his son Orion that he cut the hinges on the gate and set it up so that if the gate was touched it would fall.  That night MARIA was going through her usual routine of closing and locking the back gate.  When she went to pull the gate closed it fell on her causing her to hit her head on the road."  Maria was unable to lift the gate and used her cell phone to call Jessica and ask for help.  Jessica was able to lift the gate, an ambulance was called, Maria was transported to the hospital, and Maria spent the night at the hospital's emergency room.  Maria's medical bills amounted to $22,122.85.

The court also found that (1) on December 1, 2013, John parked his truck in Maria's driveway and started videotaping; (2) Maria attempted to grab the camera; (3)

27.

John hit her and grabbed her arm, holding her against the truck; and (4) John then backed up his truck while still holding onto Maria. Because the truck was turning while it backed up, Maria "felt like his intentions was driving over my legs."

### C. John's Claims of Trial Court Error

#### 1. John's Opening Brief

Part IV.C. of John's opening brief (which we quoted in part III.B.1., *ante*) asserts the trial court erred by finding in Maria's favor on the battery cause of action because the findings on the battery and other causes of action were "not supported by any substantial evidence." As described below, we reject this conclusory assertion of error regarding the battery claim for the same reasons it was rejected regarding the assault claim. (See pt. III.C.1., *ante*.)

First, John failed to "set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly*, *supra*, 177 Cal.App.4th at p. 218.) To illustrate, the opening brief failed to describe his son's testimony that John "was talking about the back gate and how he had cut it and set it up so if anybody touched it[,] it would fall" and that he asked John to "repeat it because I wanted to make sure I understood what he was telling me." As a result of the deficient description and analysis of the evidence, John failed to affirmatively demonstrate trial court error based on the lack of substantial evidence and, thus, failed to overcome the presumption that a judgment is correct.

Second, the trial court's findings are supported by substantial evidence—specifically, the testimony of Maria and Orion. (See *In re Marriage of Mix, supra,* 14 Cal.3d at p. 614 [testimony of a party may constitute substantial evidence].) John's arguments suggest Maria's testimony was not credible and, therefore, was not substantial evidence. We reject that suggestion because John has not (1) identified the legal standard that must be met to establish a trial court's implied credibility finding was error (see pt.

II.B., *ante*) and (2) applied that standard to demonstrate the court erred in finding Maria's testimony about the two incidents was credible.

### 2. *John's Reply Brief and the December 1, 2013 Incident*

John's reply brief addresses the batteries that occurred on October 22, 2013, and December 1, 2013, separately. Next, we address his arguments regarding the December 1, 2013 incident.

John asserts (1) the battery cause of action in Maria's complaint addressed only the October 22, 2013 gate incident; (2) Maria failed to amend her complaint to include a second count of battery addressing the December 1, 2013 incident; (3) the failure to amend deprived him of the opportunity to (a) file an amended answer and allege that count was barred by the two-year statute of limitation in section 335.1 file and (b) subpoena the sheriff's deputy who responded along with his reports and the photos he took that day. John contends he raised these arguments in his motion to strike a portion of Maria's closing trial brief, his objections to the proposed statement of decision, and his motion for a new trial.

The first reason we reject John's arguments about the December 1, 2013 battery is because appellate courts are not required to consider an issue raised for the first time in a reply brief. (See *Herrera v. Doctors Medical Center of Modesto*, *supra*, 67 Cal.App.5th at p. 548 [" 'points raised for the first time in a reply brief are not considered by the court' "].) Accordingly, we reject John's arguments addressing the assault cause of action that are raised for the first time on appeal.

A second, independent ground for rejecting the argument is that John has not demonstrated that the complaint's allegations, when read as a whole, do not encompass the December 1, 2013 battery. In particular, the battery cause of action incorporates the allegations made in the preceding paragraphs, which includes the broadly phrased allegations in the assault cause of action. The assault cause of action alleged acts against Maria that included "following or stalking" her and "making threats of physical harm" to

29.

her. Applying a liberal interpretation to these allegations, which is required by section 452, John's videotaping of Maria from his truck is encompassed by the "following or stalking" allegation and beginning to back up the truck while holding onto Maria involves a threat of physical harm to her.

A third, independent ground for rejecting John's claim of error is that John has failed to demonstrate the trial court's inclusion of the determination that he committed a battery on December 1, 2013 was a prejudicial error. (See Cal. Const., art. VI, § 13; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellant must demonstrate both error and prejudice for every argument raised on appeal].) The test for prejudice is whether there is a reasonable probability that a result more favorable to the appellant would have been obtained in the absence of the error. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570; § 475.) A reasonable probability means a reasonable chance, more than an abstract possibility; it does not mean more likely than not. (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287.) With respect to the December 1, 2013 battery, there is no reasonable probability that John would obtain a more favorable result if the matter were remanded to the trial court because the damages, if any, awarded for that incident would have overlapped with the damages awarded for intentional infliction of emotional distress. Maria did not testify to any physical injury from the incident and did not present any related medical bills. Consequently, if the trial court did assess any damages for the incident, it would have been attributed to the emotional distress that resulted, making it redundant to the damages recovered under another cause of action. (See generally, *State Rubbish etc. Assn. v. Siliznoff*, *supra*, 38 Cal.2d at p. 338 [in cases of assault and battery, "mental suffering will frequently constitute the principal element of damages]".)

In summary, we conclude the trial court did not commit prejudicial error when it included findings that John committed a battery on December 1, 2013, in the statement of decision.

30.

### 3. *John's Reply Brief and the October 22, 2013 Gate Incident*

John contends there was no evidence he intentionally or negligently "removed any gate and place[d] it in a dangerous location on the 100-acres" or that he caused Maria to suffer an injury. He also contends the evidence proves he was not the cause of the injuries for which Maria was treated after the gate incident because she was treated for preexisting, ongoing injuries.

More specifically, John contends the evidence is insufficient to support all the essential elements of the battery cause of action because the "evidence only supports that JOHN intended to remove a locked gate that MARIA closed each night to keep him from accessing the property's irrigation system … and that JOHN placed the gate far away leaning backward so it wouldn't fall and that JOHN had [n]o intention of MARIA having contact with the gate and being injured." John argues no reasonable person would stumble around in the dark and move the gate back into position.

These arguments by John are simply a request for this court to reweigh the evidence in a manner that is unfavorable to the judgment. When applying the substantial evidence standard of review, appellate courts do not reweigh the evidence. (See *Montebello Rose Co. v. Agricultural Labor Relations Bd.*, *supra*, 119 Cal.App.3d at p. 21.) John's view of the evidence directly contradicts the finding in the statement of decision that "JOHN told [his son] Orion that he cut the hinges on the gate and set it up so that if the gate were touched it would fall." In comparison, the court's finding closely tracks Orion's testimony during the trial and, thus, is supported by substantial evidence.

John's reply brief also contends the respondent's brief (1) asserts testimony of witnesses should be considered without providing any cites to the volume and page number of that testimony and (2) recites the statement of decision's erroneous findings of fact that also lack any citation to the record. John states these acts were not just error, but were done negligently and maliciously by Maria's attorney and the trial court judge because they had possession of the reporter's transcripts, which they passed between

31.

them, but denied him those transcripts. We reject this claim of error. First, John has cited, and we have located, no authority requiring a statement of decision to include citations to the record. Thus, the trial court did not err by failing to include citations to the testimony in its statement of decision or in the judgment. Second, John has the burden on appeal of showing substantial evidence does not support the trial court's findings. His challenges to the adequacy of Maria's brief and her reliance on the findings included in the statement of decision do not aid him in affirmatively demonstrating his claim of trial court error. Whether or not a respondent's brief is filed, the appellant still bears the affirmative burden of showing error and appellate courts are obligated to examine the points raised by the appellant to see if a reversal is merited. (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078; *City of Desert Hot Springs v. Valenti* (2019) 43 Cal.App.5th 788, 792, fn. 5; see Cal. Rules of Court, rules 8.220(a)(2), 8.163 [presumption from the record].)

In summary, we conclude John has failed to demonstrate the trial court committed prejudicial legal or factual error when it determined John committed the tort of battery on two occasions.

## V. NEGLIGENCE CAUSE OF ACTION

Maria's negligence cause of action is related to the cutting of the hinges on the gate and the resulting injury to her. The trial court concluded Maria met her burden of proving John was negligent based on the same facts that established her claim for battery. The court stated John failed to use reasonable care on October 22, 2013, when he cut the hinges on the back gate, knowing it would fall when Maria tried to close it. As to the other defendants, the court concluded Maria did not meet her burden of proving they were negligent with regard to the gate incident.

For the same reasons we upheld the trial court's determinations with respect to the battery cause of action, we conclude John has failed to affirmatively demonstrate the trial court erred in concluding he was negligent in cutting the hinges on the gate, knowing it

would fall when Maria tried to close it.  Thus, the court correctly held John liable for negligence.

## VI.    CONVERSION AND PROPERTY DAMAGE

Maria's sixth cause of action alleged defendants took possession and control of electricity provided to Maria by Pacific Gas and Electric for the operation of the residential water pump and diverted the electricity to their use without her consent.  The trial court found "in favor of defendants on the claim as it relates to the PG&E account."

Maria's ninth cause of action was labeled "Property Damages – Vandalism" and alleged that, from about March 24, 2013, defendants engaged in a course of conduct against her that involved vandalizing her personal property for the purpose of causing her economic damages and driving her off the 100 acres.  The general allegation about a course of conduct of vandalizing Maria's personal property was followed by allegations about specific items of property damages, "including but not limited to" gate hinges, gates, and Maria's personal and business vehicles.

The trial court found John, through his employee Jamie Pelanda, wrongfully took possession of 28 Sago palms, which had a value of $10,000.  The court also concluded (1) the evidence established that John was responsible for damages to gates, locks and cameras and (2) Maria sustained damages in the amount of $1,255.  As a result, the court found Maria "has proven JOHN is liable for conversion/property damage and finds in her favor on that cause of action."  The statement of decision addressed the amount of damages to be awarded Maria as follows:  "Fair market value at the time of the conversion/property damage:  $12,550.00."[9]

---

[9]    The amount of $12,550 is an obvious typographical or mathematical error.  The damage to the locks and chains ($250), cameras ($900), and gates ($105) totaled $1,255.  When $1,255 is added to $10,000 (the value of the 28 palms), the sum is $11,255.  Accordingly, our disposition directs the trial court to correct the third page of the amended judgment by changing the amount of "$12,550" in paragraph B.3. to "$11,255."

John's opening brief asserts there is no evidence of any defendant taking or removing cameras belonging to Maria and "this is not a complaint allegation."  The brief also asserts the judgment and statement of decision's award of property damages of $12,550 was not based on the allegations of the complaint.

We reject John's "no evidence" claims for the same reasons we rejected his challenges to the sufficiency of the evidence on the other causes of action.  In addition, we reject his argument about exceeding the allegations of the complaint because the broad language used in the ninth cause of action is sufficient to encompass the cameras, locks and damages included in the trial court's findings.

VII.    INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

A.    <u>Legal Principles</u>

The torts of intentional and negligent interference with prospective economic advantage impose liability for improper methods of disrupting or diverting the business relationship of another that fall outside the boundaries of fair competition.  (*Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845.)  These torts are "variously known as interference with 'prospective economic advantage,' 'prospective contractual relations,' or 'prospective economic relations.' "  (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 378.)  They also have been described as " 'interference with *business* relations or advantages.' "  (*Optronic Technologies, Inc. v. Celectron Acquisitions, LLC* (2025) 108 Cal.App.5th 770, 788, italics added.)  The underlying principle is that everyone has the right to establish and conduct a lawful business and is entitled to the protection of organized society, through its courts, whenever that right is unlawfully invaded.  (*Settimo Associates*, *supra*, at p. 845.)

The elements of tortious interference with prospective economic advantage are (1) the existence of an economic relationship between the plaintiff and a third party having a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional or negligent independently wrongful act

34.

designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.  (*Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1404–1405; see CACI No. 2202 [Intentional Interference With Prospective Economic Relations]; CACI No. 2204 [Negligent Interference With Prospective Economic Relations].)  To satisfy the independent-wrong requirement, a plaintiff must prove "the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself.' " (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1142.)  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159.)  In the case of negligent interference, the independent wrong can be established by the defendant's breach of a duty of due care owed to the plaintiff. (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 787.)

Next, we address the principles governing the damages for which a defendant may be found liable.  California's general measure of damages for tortious wrongs is set forth in Civil Code section 3333, which provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (See *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 446 [this measure of damages is designed to fully compensate the tort victim for all the injury suffered].)  The phrase "breach of an obligation not arising from contract" refers to a tort.

In accordance with these general principles, California courts recognize "[t]he measure of damages for intentional interference with contractual relations or prospective economic advantage is 'an amount that will reasonably compensate plaintiff for *all* loss or harm.' " (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 232,

35.

italics added.)[10]  The losses or harms include " 'the diminution of the value of the business traceable to the wrongful act, as reflected by loss of profits, expenses incurred, or similar concrete evidence of injury.' " (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 257; see 40 Cal.Jur.3d (2022) Interference with Economic Advantage, § 45, p. 91.)

B.    Maria's Allegations

The fourth and fifth causes of action in Maria's complaint were for intentional and negligent interference with prospective economic advantage.  Maria alleged that since 1986 she has (and, with her deceased husband, had) owned and operated a business known as Sago Rey Trading at 3535 South Temperance Avenue.  The "business was and is growing and selling palm and other trees and plants to the public for economic benefit."  Maria alleged she established an economic relationship with the public as customers and potential customers and they entered the property from Temperance Avenue to browse and purchase trees and plants.  She also alleged (1) defendants, with the intent to harm her financially, interfered with customers and (2) defendants' actions were a substantial factor in her losing customers.  In a broader allegation, Maria asserted that, as a proximate result of defendant's "acts and conduct, *as alleged above*, [she] has suffered *economic damages* in an amount according to proof."  (Italics added.)  In part VII.D., *post*, we explain the significance of the phrase "as alleged above" and the term "economic damages" that are italicized.

C.    Trial Court's Decision

The trial court determined John and Peggy (but not Guy) intentionally interfered with Maria's prospective economic advantage and the three defendants negligently

---

**10**    The Restatement Second of Torts, section 774A provides in part: "(1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for [¶] (a) the pecuniary loss of the benefits of the contract or the prospective relation; [¶] (b) consequential losses for which the interference is a legal cause; and [¶] (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

interfered with Maria's prospective economic advantage. As to causation and economic harm, the court found Maria "was forced to move her business to another location as a result of the wrongful acts of [John and Peggy]" and "[t]he cost of relocating her business was $100,000." The court also found Guy's negligent "actions were a substantial factor in causing harm to MARIA." Accordingly, the court concluded John, Peggy and Guy were jointly and severally liable to Maria for $100,000 in economic damages for interfering with Maria's prospective economic advantage.

### 1. Intentional Interference

The following findings were made in the statement of decision. The defendants were all aware of Maria's palm business on the 100 acres and were aware that customers came to the property to purchase palms from Maria. "There were several acts committed by JOHN and [Peggy] that … were intended to disrupt the economic relationship between MARIA and her customers."

In March 2013, John placed a large shipping container across the driveway leading to the portion of the 100 acres where Maria operated her business. John did it deliberately in an effort to block vehicles, including Maria's customers, from accessing her business. He also placed a no trespassing sign on the container. The placement of the container prevented vehicles from using the driveway to reach Maria's business. For instance, trucks were unable to deliver palm trees to Maria. Requests were made to John to move the container. He refused. The container remained across the driveway for approximately six months until Maria's brother and a friend, Matt Stafford, moved it.

In addition, John would lock the gate, which impeded access to the property. John, or persons acting at his direction, would place chains on the valves to the pumps to lock out the irrigation system, which denied Maria access to the water. When Matt Stafford tried to help with watering the nursery area, he found broken or missing valves and saw where valves had been locked. Robert Gonzalez, who was hired by Maria to consult on security, went with Maria to turn on the valves and he saw John turn off the

37.

pump and sit there to prevent the water from going where Maria wanted it. John directed the irrigation to areas on the property he received in the settlement and the orchard on Maria's side was wiped out due to the lack of water.

Maria installed drip lines to water her plants, but John consistently cut them. Maria put up cameras to determine how the drip lines were being cut and footage from one camera showed John at the drip line with pruning shears. John stated that he cut the drip lines because he was tripping over them.

John also would come to the nursery area when Maria had customers and would call the Fresno County Sheriff's Department. These actions discouraged Maria's customers from coming to the property. In June 2017, John had a trench dug along the driveway, which impeded access to Maria's business. John's son heard John express anger and frustration towards Maria and understood that his father's goal was to cause Maria as much financial damage as he could.

Peggy was involved in multiple incidents that interfered with Maria's business and discouraged customers from accessing the property. In July 2016, Peggy sat at the pump and prevented Maria from accessing it to water her plants. Peggy also (1) approached a customer's car, which resulted in the customer leaving; (2) instructed a repairman hired by Maria to leave the property; and (3) in June 2017, after John had a trench dug along the driveway leading to Maria's residence and business, Peggy stood in front of a gate and instructed anyone who was trying to enter the property, including Maria, to leave. Peggy was not employed by John, but her involvement in preventing Maria access to the pump and preventing customers from using the driveway was at John's direction. As a result of the wrongful acts of John and Peggy, Maria was forced to move her business and incurred $100,000 in relocation costs.

To summarize, the trial court found John and Peggy knew Maria had a business on the property, intentionally interfered with and disrupted that business, forcing Maria to move the business from the property, which caused an economic loss—specifically,

38.

$100,000 in relocation costs. In addressing Maria's claim for punitive damages, the court found John "set out on a campaign to force MARIA off the property"; he told her "that he would run her off the property"; and he engaged in malicious and despicable conduct to accomplish his goal.

### 2. Negligent Interference

In the part of the statement of decision addressing negligent interference, the trial court found John put up "no trespassing" signs and prevented Maria from watering her palms and other trees by chaining the valves on the water pump. John also instructed Guy, his employee at the time, to chain valves and remove the battery used to start the diesel engine that powered the irrigation pump. These acts blocked Maria's access to water she needed for her business. Guy, at John's direction, also took valves out of the stand pipes to prevent Maria from using the irrigation system. Although Guy's interference was at the direction of John, Guy knew Maria had a palm business on the property, knew she needed water for the trees, and knew or should have known that preventing her access to water would interfere with her business. The trial court found Guy's actions were a substantial factor in causing harm to Maria. The trial court found in favor of Maria and against John, Peggy and Guy on the cause of action for negligent interference with prospective economic advantage.

The damages for the negligent interference were the same economic damages awarded for the intentional interference. The court held John, Peggy and Guy jointly and severally liable for the $100,000 in relocation costs.

### 3. Evidence of Damages

On the ninth day of trial, Maria answered "Yes" when asked if she lost customers as a result of John coming out and confronting people. When asked how she knew she had lost customers, Maria said: "Especially when he called the sheriffs and the sheriffs show up in my nursery when there's customers there that — nobody wants to be around when sheriffs come to my place so they leave." When asked to quantify the number of

39.

times it happened, Maria answered: "A lot." During John's examination of Maria, he asked when her business started to decline. Maria answered: "I start having trouble with customers find[ing] me after the container got placed in the middle of the driveway. A lot of people thought that I was out of business." The trial court did not award any damages for lost sales or profits.

On the 10th day of trial, Maria testified about the costs she incurred as a result of the interference with her business. During direct examination by her attorney, the following exchange occurred:

"Q     And how much, in your opinion, have you suffered in losses, business losses, from having to move your nursery from the one location to the other?

"A     Over $100,000.

"Q     Have you had to rebuild a new office?

"A     Yes.

"Q     How much did it cost to build a new office?

"A     That building is already there so that only – you know, like putting the floor and putting the little counter. I already had the computers. I just move the computers over there. I just – the pots and dirt and labor. They move – move the plants.

"Q     But you feel that the move has cost you over a $100,000.

"A     Yes.

"Q     Is that money that you needed to spend absent being basically run out of the Temperance address?

"A     Yes. I'm sorry. I don't hear.

"Q     Would you have had to spend that money if you hadn't been run out of the Temperance address.

"A     No."

During Peggy's cross-examination of Maria about the $100,000 in costs, Maria testified about moving palms from the 100 acres to the 40 acres, stating she had to use a crane to move the big ones and the crane was "real expensive." Later, Maria distinguished between palm trees north of the driveway that would have been moved pursuant to the terms of the settlement agreement in the 2009 Partition Action and plants and palms south of the driveway. In accordance with the agreement, Maria said she was not going to move the ones south of the driveway and in boxes, but only the ones in the ground north of the driveway. When asked how many she moved in the boxes on the south side, Maria said: "All the ones in – in the back of the nursery. The ones in the north side of the nursery, south of the driveway. The ones in between the greenhouses and some around my house." She also stated most of the ones on the south side were moved in 2017 and 2018, but she started moving plants to the 40 acres in the end of 2015 when her son moved to the 40 acres. Maria testified that she hired Midnight Crane and a couple of others and moving costs were between $580 and $1,100 per palm.

After the trial court sustained objections to questions about the number of Queen palms moved from the north side of the driveway, the court stated its understanding was that the moving of Maria's business had to do with plants south of the driveway. Maria's counsel confirmed that plants on the north side of the driveway had to be moved by August 10, 2020, pursuant to the settlement agreement, and Maria was not claiming the moving costs for those but was claiming the cost of moving the palms from the nursery area south of the driveway. He asserted Maria could not operate her business there without interference.

D.    Damages Sought in the Complaint

Defendants contend the damages alleged in the complaint were only for lost customers and, therefore, Maria cannot recover the costs of relocating the business to the 40 acres. This contention implies that Maria was required by California pleading law to specifically allege each item of damages she claimed were caused by the defendants'

41.

conduct that interfered with her business. As explained below, we reject this contention. (See generally, *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 549–550 [ordinarily, a complaint is sufficient if it alleges ultimate facts rather than evidentiary facts]; *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099.)

The phrase "as alleged above" and the term "economic damages," which we italicized in part VII.B. of this opinion are significant to defining the scope of Maria's claims. The acts and conduct "alleged above" includes the assault, batteries, and negligent conduct alleged in her first three causes of action because the fourth and fifth causes of action explicitly incorporated all the allegations made earlier in the complaint. Consequently, when the fourth and fifth causes of action are liberally construed as required by section 452, the acts and conduct of defendant that caused her to lose customers and, more broadly, caused her to suffer "economic damages" include the assault, batteries, and negligence alleged. Those three causes of action set forth independently wrongful (i.e., tortious) conduct that made it more difficult for Maria to operate her business on the 100 acres and that was part of John's campaign to force Maria off the 100 acres.

The term "economic damages" is significant in defining the scope of the damages sought. It is a general term that, when construed in accordance with section 452, is not limited to lost sales or profits. Rather, it is broad enough to encompass expenses incurred such as the costs of relocating the business. (See *Diodes, Inc. v. Franzen*, *supra*, 260 Cal.App.2d at p. 257 [expense incurred are a recoverable loss].) In other words, in the context of this case, the term "economic damages" alleged an ultimate fact and more particularity was not required. (See *Doe v. City of Los Angeles*, *supra*, 42 Cal.4th at p. 550 [allegation of ultimate facts is sufficient for pleading purposes].) Therefore, the complaint's allegations regarding the damages sought for interference with Maria's business included the costs of relocation.

42.

E.    Claims of Trial Court Error

John's opening brief states the questions raised in this appeal include whether Maria pleaded and met her burden of proving all the essential elements of her causes of action for interference with prospective business advantage.  In particular, John contends (1) Maria failed to prove the existence of a business relationship with which he interfered; (2) Maria failed to prove she lost an existing business customer and the related economic harm; (3) Maria failed to prove that any interference by contact with her customers during the two-year period covered by the complaint was wrongful conduct independent of the interference; and (4) with respect to negligent interference, Maria did not establish (and the statement of decision did not conclude) John owed her a duty of care and breached that duty.

1.    *Existence of an Economic Relationship*

In *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, the Supreme Court described this element as follows:  "(1) the existence, between the plaintiff and *some third party*, of an economic relationship that contains the probability of future economic benefit to the plaintiff."  (*Id*. at p. 512, italics added.)  We reject John's argument that Maria failed to prove this element.  Maria proved that she had an ongoing palm business on the 100 acres near her residence for many years, customers came to the 100 acres to buy palms, and potential customers who came to the 100 acres did, in fact, meet with interference by defendants.  We conclude that when potential customers came to the 100 acres, there was a probability that they would make a purchase, which satisfied the "probability of future economic benefit to the plaintiff" requirement.  (*Ibid*.)  John's argument suggests that, to establish the requisite economic relationship, Maria needed to prove the identity of specific potential customers and, perhaps, the specific purchases they probably would have made.  We conclude this particularity of proof is not required to show "some third party" was a potential customer. (*Ibid*.)  Maria adequately proved the existence of "some third part[ies]" interested in

43.

purchasing items from her inventory, which was sufficient to show "the probability of future economic benefit to [Maria]." (*Ibid.*)

We note that, had the damages recovered included lost profits, more evidence about Maria's customer base and lost transactions may have been required under the principle that damages for the loss of prospective profits by an established business cannot be recovered unless the evidence makes reasonably certain both their occurrence and extent, though mathematical precision is not necessary. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774.)

### 2.    *Loss of an Economic Relationship*

John's argument that Maria did not prove she lost an existing business customer again suggests the identity of a particular customer must be proven. Thus, that aspect of the argument fails for the reasons stated above.

Furthermore, the *loss*-of-an-existing-customer argument mischaracterizes the elements of the interference torts. Those elements refer to the "actual disruption of the [economic] relationship" and "economic harm proximately caused by the defendant's action." (*Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 1005.) We conclude an economic relationship may be disrupted by more than the loss of an existing business customer. Webster's Third New International Dictionary (1993) defines the verb "disrupt" to mean "to throw into disorder" and "to interrupt to the extent of stopping, *preventing normal continuance of*, or destroying." (*Id*. at p. 656, italics added.) "Disruption" means "the state of being disrupted." (*Ibid*.) In the circumstances of this case, the normal continuance of Maria's relationship with potential customers included continuing to operate the business at its location on the 100 acres. Stated another way, her prospective economic advantage included operating a business in close proximity to her residence. Defendant's actions prevented her from continuing her normal operations by forcing her to move a substantial portion of those operations (i.e., the operations south of the driveway). We conclude the actions that prevented Maria from continuing to

44.

operate the business on the 100 acres constitutes an actual disruption of Maria's relationship with potential customers and satisfies that element of the interference causes of action.

John's argument also suggests that the only type of harm for which liability may be imposed is the loss of the money that would have been made if the lost customer would have completed a purchase. (See pt. VII.D., *ante*.) We reject this suggestion because it is contrary to California's measure of damages for an interference with prospective economic advantage. Recoverable economic losses include "expenses incurred." (See *Diodes, Inc. v. Franzen*, *supra*, 260 Cal.App.2d at p. 257.)

### 3. *Independent Wrong*

Next, we consider defendants' argument that Maria did not prove any interference by contact with her customers during the two-year period before the filing of the complaint was wrongful conduct independent of the interference. John's reply brief also argues the trial court failed to make the necessary findings that the alleged acts of interference were independently wrongful.

Again, these arguments take an inappropriately narrow view of an actual disruption of an economic relationship by focusing on direct contact with customers. It is possible for a defendant to disrupt an economic relationship by disrupting the operations of a business before contact with a specific customer occurs. As found by the trial court, Maria's business relations with her customers were disrupted by the blocking delivery trucks bringing inventory, stealing her palm trees, denying her access to water needed to keep her business going, and cutting watering hoses. We conclude these findings are supported by substantial evidence and the acts found qualify as disrupting for purposes of the interference claims.

John's argument that the trial court failed to find any independently wrongful conduct that disrupted Maria's business and the economic relations with her customers overlooks the finding that John engaged in a campaign to force Maria from the 100 acres

and part of the campaign was disrupting Maria's business. Moreover, John's campaign against Maria consisted of many independently wrongful acts, including assault, battery, negligence, intentional infliction of emotional distress, and conversion or destruction of her property. The statement of decision also referred to the civil harassment restraining order against John. Civil harassment is independently wrongful because it violates a standard of conduct established by statute—specifically, section 527.6. (See *Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at p. 1159 [action is independently wrongful if it is proscribed by a statutory standard].) Thus, John's harassment of Maria is a further demonstration of how his campaign against Maria included conduct that was independently wrongful. To summarize, we conclude the element of John's independently wrongful conduct was sufficiently proven.

Peggy also contends the trial court erred in determining she intentionally interfered with Maria's prospective economic advantage without determining her actions were independently wrongful. We conclude Peggy has failed to establish prejudicial error on this ground.

First, paragraph B.2. of the amended judgment states that Maria is awarded economic damages of $100,000 against Peggy only on the cause of action for negligent interference with prospective economic advantage. No monetary liability is imposed on Peggy for intentional interference. Thus, any error in determining Peggy intentionally interfered with Maria's prospective economic advantage was not prejudicial.

Second, and more significantly, the statement of decision included the general finding that Maria "was forced to move her business to another location as a result of the *wrongful* acts of" John and Peggy. (Italics added.) In addition, it specifically described Peggy's actions that constituted the wrongful conduct and these findings are sufficient to establish those actions were independently wrongful. These actions included preventing Maria from accessing a pump, instructing a repairman to leave the property, and preventing Maria's customers from using the driveway. These actions were independent

46.

wrongs because they violated Maria's rights as a cotenant of the 100 acres holding an undivided one-half interest.

"Each joint tenant and tenant in common has an equal right to possession of the entire property, and no cotenant has a right to the exclusive possession of the property as against another cotenant." (4 Miller & Starr, Cal. Real Estate (4th ed. 2025) § 11:2.) Accordingly, "no cotenant has the right to exclude another cotenant from any portion of the property." (*Ibid*.) We conclude the actions of Peggy that excluded Maria from her rights as a cotenant to the well and driveway constitute independent wrongs for purposes of the claims for interference with prospective business advantage. Peggy has not shown any ground recognized in law that justify her impingement of Maria's rights as cotenant. For example, Peggy has not shown Maria entered into an agreement providing exclusive rights to John or anyone else. (4 Miller & Starr, Cal. Real Estate, *supra*, § 11:34.) Similarly, Guy's negligent conduct violated Maria's rights by excluding her from use of the wells.

In sum, we reject defendants' claim that the trial court failed to determine that they engaged in independently wrongful conduct.

### 4. *Negligent Interference and a Duty of Care*

" 'The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care.' (*Stolz v. Wong Communications Limited Partnership* (1994) 25 Cal.App.4th 1811, 1825.)" (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 348.) Defendants rely on the foregoing principle and contend they did not owe Maria a duty not to interfere with her customers or business. We reject this argument because the trial court's findings establish that defendants committed independently wrongful acts and those wrongful acts violated a duty of care owed to Maria. In other words, the trial court did not determine the defendants were liable for negligent interference with Maria's prospective economic advantage based solely on the conduct interfering with Maria's business.

47.

F.      Joint and Several Liability for Guy's Negligent Interference

The Fair Responsibility Act of 1986 (Civ. Code, § 1431 et seq.), popularly known as Proposition 51 or the Deep Pocket Initiative, was adopted by California voters to modify the long-established rule of joint and several liability of multiple tortfeasors.  (5 Witkin, *supra*, Torts, § 158, p. 291.)  Civil Code section 1431 provides in part that "[a]n obligation imposed upon several persons … is presumed to be joint, and not several, except as provided in Section 1431.2[.]"  Civil Code section 1431.2, subdivision (a), provides:

> "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

"Thus, in an action subject to Proposition 51, each tortfeasor remains jointly and severally liable to the plaintiff for economic damages, but is liable to the plaintiff for only its proportionate share of noneconomic damages."  (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 102.)  Intentional tortfeasors do not fall within the scope of the modifications implemented by Proposition 51.  (*Burch v. CertainTeed Corp.* (2019) 34 Cal.App.5th 341, 359.)  For instance, Proposition 51 "does not authorize a reduction in the liability of intentional tortfeasors for noneconomic damages based on the extent to which the negligence of other actors—including the plaintiffs, any codefendants, injured parties, and nonparties—contributed to the injuries in question."  (*B.B. v. County of Los Angeles* (2020) 10 Cal. 5th 1, 29.)

Here, the $100,000 in damages awarded on the two causes of action for interference with prospective economic advantage was for economic damages only— namely, relocation costs.  As a result, the principle that "each tortfeasor remains jointly and severally liable to the plaintiff for *economic* damages" applies to the award.  (*Garcia*

48.

*v. Duro Dyne Corp.*, *supra*, 156 Cal.App.4th at p. 102, italics added.) In other words, the trial court was not required to allocate liability for the $100,000 in economic damages among the three defendants.

Despite the foregoing conclusion that it was appropriate under California law to hold John, Peggy and Guy jointly and severally liable for the $100,000 in economic damages, we next consider the arguments raised in Guy's opening brief. There, he contends the award holding him jointly and severally liable for the $100,000 in economic damages was not authorized under Proposition 51 because the statement of decision "finds 'zero' and not even a fraction of liability (fault) based on complaint allegations of negligent contact causing interference with business customers for either the intentional [or] negligent interference with prospective economic relations." In addition, his reply brief argues there was no finding that he interfered with customers, no finding of concurrent tortfeasor acts involving him, and no finding that his act of working with the irrigation system, pump and valves was at John's direction.

Based on Guy's arguments, we consider whether he has demonstrated the trial court erred in holding him jointly and severally liable for the cost of relocating Maria's business. To avoid an implied finding in favor of the prevailing party after issuance of a statement of decision, a party must raise an objection in the trial court. (*In re Marriage of Arceneaux, supra,* 51 Cal.3d at p. 1133; see § 634.) If "a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134.) In accordance with these principles, we deem Guy's arguments about the absence of particular findings forfeited because the appellate record does not include any objections made by Guy to the proposed statement of decision and, thus, the record does not show the arguments were presented to the trial court when it had an opportunity to

49.

cure the asserted deficiencies.  In such circumstances, the doctrine of implied findings applies.

## VIII.  PUNITIVE DAMAGES

### A.    Background

The trial court determined John was liable for punitive damages in the amount of $75,000.  It also determined Maria had not met her burden of proving that Guy and Peggy were liable for punitive damages.

The statement of decision referred to Civil Code section 3294 and stated Maria was required to show by clear and convincing evidence that defendants' conduct involved malice, oppression or fraud.  The court defined oppressive conduct as that which "is despicable and subjected [Maria] to cruel and unjust hardship in knowing disregard of her rights."  The court found John's conduct "was malicious and despicable" and explained this finding of ultimate fact by providing the following, more specific findings:

> "The evidence with regard to the gate incident alone is sufficient to warrant the imposition of punitive damages.  JOHN deliberately cut the hinges off of a gate that he knew MARIA closed every night.  He told his son that he placed the gate in a position that if someone moved it, it would fall.  The evidence supports that JOHN set out on a campaign to force MARIA off the property.  JOHN told MARIA that he would run her off the property.  The evidence shows that JOHN intentionally engaged in malicious and despicable conduct to accomplish his stated goal.  This conduct included directing employees to steal her palm trees; denying her access to the irrigation pump so she could water her trees and keep her business going, placing a large container across the road so her customers were denied easy access to her business, riding his quad around her residence at all times of the day or night, cutting watering hoses, destroying surveillance cameras and pointing a gun at her."

The court found John had "the financial means to pay an award of punitive damages as he is part owner of property of significant value."  We infer the property referenced is John's one-half interest in the 100 acres.  Also relevant to John's financial condition is the finding that in February 2012 he was tendered the $270,000 purchase price for his interest in the 40 acres.

50.

John's objections to the proposed statement of decision asserted the punitive damages of $75,000 were excessive, against the law, no evidence established his ability to pay the damages, and there was no relationship between the amount of the compensatory damages and the punitive damages. To support these objections, John cited *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.

### B.     Principles Prohibiting Excessive Punitive Damages

A defendant's liability for punitive damages under California law is governed by statute. (See Civ. Code, §§ 3294, 3295.) Plaintiffs who prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice … may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) The statute's purpose "is to punish wrongdoing and thereby to protect [the public] from future misconduct, either by the same defendant or other potential wrongdoers." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*).) This objective " 'is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.' " (*Ibid*.) In other words, the purpose of punitive damages is not to financially destroy a defendant, but to deter. (*Id*. at p. 112.) Under these principles, we are responsible for determining whether the trier of fact's award of punitive damages is excessive as a matter of law. (*Id*. at pp. 109–110.)

We must consider three factors when assessing whether an award of punitive damages is excessive for purposes of California law. (*Neal v. Farmers Ins. Exchange*, *supra*, 21 Cal.3d at pp. 927–928; *Adams*, *supra*, 54 Cal.3d at p. 110.) These factors are (1) the degree of reprehensibility of the defendant's misconduct; (2) the amount of compensatory damages awarded; and (3) the wealth of the particular defendant. (*Neal*, at p. 928.) Where an award is reasonable in light of the first two factors, it "can be so disproportionate to the defendant's ability to pay that the award is excessive for that reason alone." (*Adams*, at p. 111; see Perry & Kantorowicz-Reznichenko, *Income-*

51.

*Dependent Punitive Damages* (2018) 95 Wash. U.L. Rev. 835, 881 [California is among the many states that recognize the relevance of the defendant's wealth in determining the amount of punitive damages].)

The Due Process Clause of the Fourteenth Amendment to the United States Constitution also imposes limits on state court awards of punitive damages. (See *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 (*State Farm*); *BMW of North America v. Gore* (1996) 517 U.S. 559, 568 (*BMW*).) Federal due process entitles a tortfeasor "to ' "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." ' " (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 (*Simon*).)

The United States Supreme Court established three "guideposts" for determining whether a punitive damages award is unconstitutionally excessive: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm*, *supra*, 538 U.S. at p. 418; see *BMW*, *supra*, 517 U.S. at p. 575.) The first two guideposts parallel the first two factors used in the state law analysis. (See *Doe v. Lee* (2022) 79 Cal.App.5th 612, 618–619.)

C.     Analysis of the Punitive Damages Award

        1.     *Sufficiency of the Evidence—Liability*

John's argument that the findings that are the basis for his liability for punitive damages are not supported by substantial evidence repeat the contentions he made in challenging the findings on the intentional torts—namely, assault, battery, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and damage to property. Accordingly, we reject John's challenges to the sufficiency of the evidence establishing his conduct was malicious and despicable, which is the basis for the determination he is *liable* for punitive damages, for the same reasons

that we rejected those challenges directed at his liability for the intentional torts. Next, we consider his objections to the *amount* of the award.

### 2. *The Relationship to Compensatory Damages*

Both the state law factors for excessive punitive damages and the federal due process guideposts look at the relationship between the amount of compensatory damages awarded and the amount of punitive damages awarded. In *State Farm*, the United States Supreme Court rejected "a bright-line ratio which a punitive damages award cannot exceed," but stated that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm*, *supra*, 538 U.S. at p. 425.) Consequently, the California Supreme Court stated "that 'ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification ..., cannot survive appellate scrutiny under the due process clause.' " (*Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 372.)

Before *State Farm*, the United States Supreme Court had suggested that a punitive damages award of more than four times the compensatory damages might be close to the line but was not unconstitutional. (*Pacific Mutual Life Ins. Co. v. Haslip* (1991) 499 U.S. 1, 23–24; see *Bennett v. American Medical Response, Inc.* (9th Cir. 2007) 226 Fed.Appx. 725, 728-729 [a ratio of 6.49:1 for punitive damages to compensatory damages was unconstitutional; case remanded with instructions that the punitive damages award not exceed a 4:1 ratio].)

Here, if the 4:1 ratio was applied to the compensatory damages for the torts of assault, battery, and intentional infliction of emotional distress ($322,122.85) the amount of the punitive damages would have been over $1.25 million. The trial court awarded less than one-sixteenth of that amount. Consequently, we conclude as a matter of law that the award of $75,000 in punitive damages is not so disproportionate to the award of

53.

compensatory awarded as to be excessive under state law or a violation of John's federal due process rights.

### 3. The Relationship to John's Financial Condition

The trial court explicitly stated John had the financial means to pay the award of punitive damages because he was a part owner of property of significant value. John's objections challenged this finding. Consequently, we consider the evidence presented during the trial about the value of property partially owned by John. On September 26, 2018, John testified he had a "50 percent undivided interest" in the 100 acres. When asked his opinion of the current value of that property, John replied: "I would estimate selling around there about $30,000 an acre." He explained: "It's just what the other farms have sold [for] around there."

Based on John's estimate of value, the 100 acres was worth approximately $3 million at the time of the trial. His 50 percent interest would have been worth $1.5 million. John's testimony constitutes substantial evidence supporting the trial court's finding that he was a part owner of property with a significant value. Furthermore, the punitive damages award of $75,000 represents only 5 percent of the value of his interest in the 100 acres. Consequently, we conclude the award was not "so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone.*" (*Adams*, *supra*, 54 Cal.3d at p. 111; cf. *Zhadan v. Downtown L.A. Motors* (1976) 66 Cal.App.3d 481, 500 [punitive damage award was excessive where it exceeded one-third of the defendant's net worth].)

In summary, we conclude the award of $75,000 in punitive damages is not excessive under state law standards and does not violate the limitations imposed by the Due Process Clause.

IX.    DISMISSAL OF JOHN'S CROSS-COMPLAINT

        A.      Applicable Statutes

Section 581, subdivision (e) provides:

> "(d)  Except as otherwise provided in subdivision (e), the court shall dismiss the complaint, or any cause of action asserted in it, in its entirety or as to any defendant, with prejudice, when upon the trial and before the final submission of the case, the plaintiff abandons it.

> "(e)  After the actual commencement of trial, the court shall dismiss the complaint, or any causes of action asserted in it, in its entirety or as to any defendants, with prejudice, if the plaintiff requests a dismissal, unless all affected parties to the trial consent to dismissal without prejudice or by order of the court dismissing the same without prejudice on a showing of good cause."

For purposes of this statute, " '[c]omplaint' means a complaint and a cross-complaint" and " '[p]laintiff' includes a cross-complainant."  (§ 581, subds. (a)(2), (a)(5).)  As a result of these definitions, the statute applies to the dismissal of John's cross-complaint.

An issue raised in this appeal is when, if ever, did the trial on John's cross-complaint commence.  Section 581, subdivision (a)(6) provides:

> "A trial shall be deemed to actually commence at the beginning of the opening statement or argument of any party or his or her counsel, or if there is no opening statement, then at the time of the administering of the oath or affirmation to the first witness, or the introduction of any evidence."

        B.      John's Request

On February 13, 2019, before appearing in the courtroom for another day of trial, John filed a request for dismissal of his cross-complaint without prejudice.  When the proceedings began that morning, the trial court announced the case and said:  "The parties are present on the Cross-Complaint.  We're beginning that this morning, Mr. Wash's cross-complaint against Ms. Banda-Wash."  When asked if he was ready to proceed, John announced that he was dismissing his claims and provided the court and Maria's counsel with a copy of his dismissal request.

55.

When Maria's counsel saw the dismissal was without prejudice, he objected and stated the dismissal should be with prejudice or the trial on the cross-complaint should go forward. John asserted he had "medical issues starting tomorrow at 1:00 [and] most of these issues will be taken care of in the [2009 Partition Action]." After a short recess, the trial court referred to section 581, subdivision (e) and stated that, once the trial has commenced and a dismissal is requested, the dismissal must be with prejudice unless the parties agree otherwise or there is a showing of good cause. The court explained that the trial had started even on the cross-complaint because it was part of the original case. The court stated, "under the circumstances, unless you're in agreement with dismissing with prejudice I believe we need to move forward this morning." After hearing John's argument about good cause, the trial court stated, "I think [Maria's counsel] has a valid basis for the objection and I don't think there's good cause to dismiss without prejudice at this point. So that leaves you with a decision." To allow John time to consider whether to dismiss with prejudice or move forward with his presentation of evidence, a recess was taken.

After the recess, John argued that he was entitled to dismiss without prejudice because the matter was bifurcated and the trial on his cross-complaint had not yet started. The trial court stated it "would agree that we deferred evidence with regard to the Cross-Complaint to hear it separately. I don't know that I agree the trial hasn't started." The court also stated the case was preceding in its entirety; there was never a request to bifurcate; the court never granted a bifurcation; "it was just agreed at the beginning that we would defer evidence on your claims until all of the evidence was in on [Maria's] claims"; and there was a crossover in the evidence that meant John did not need to go back and present evidence that had been already submitted.

After further discussion and argument, the trial court ultimately concluded the trial of the entire action had commenced, the statute did not allow a dismissal of the cross-complaint without prejudice, and the request to dismiss without prejudice would be

stricken. Over John's objection, the court stated: "The Cross-Complaint is dismissed with prejudice as Mr. Wash is not prepared to proceed[.]" In its statement of decision, the court discussed the issue of good cause by stating:

> "The trial to this point had taken five months and twenty-nine court days to complete. Considerable time and resources had been expended getting the case to this point and further delaying final resolution would not serve any legitimate purpose. In the court's assessment there was not good cause to allow a dismissal without prejudice, leaving the potential for the issues raised in the cross-complaint to be deferred to a later date."

### C. The Trial Had Commenced

John contends the trial on his cross-complaint never commenced because the trial was bifurcated and he filed his request to dismiss without prejudice before any opening statements, arguments, or witnesses were presented on his cross-complaint. Based on our independent review of the record, we reject John's contention and agree with the trial court's statement that the case had not been bifurcated. The first time the word "bifurcate," "bifurcated," or "bifurcation" appears in the reporter's transcript is on February 13, 2019, when John first asserted the trial had been bifurcated. He made that assertion as a reason for allowing him to dismiss the cross-complaint without prejudice.

### D. Good Cause

Next, we consider whether the trial court erred in determining there was no "showing of good cause" for allowing a dismissal without prejudice. (§ 581, subd. (e).) The statute does not include a full or partial definition of the term "good cause." (Cf. *People v. Accredited Surety Casualty Co.* (2014) 230 Cal.App.4th 548, 559 [bail statutes did not define "good cause"].)

In the absence of a statutory definition of good cause, we turn to general principles adopted by our Supreme Court. "The concept of good cause should not be enshrined in legal formalism; it calls for a factual exposition of a reasonable ground for the sought order. The good cause may be equated to a good reason for a party's failure to perform

that specific requirement from which he seeks to be excused." (*Waters v. Superior Court* (1962) 58 Cal.2d 885, 893.)  In making a determination of good cause, a trial court usually must consider all of the relevant circumstances of the particular case and apply principles of common sense to the totality of the circumstances.  (*People v. Engram* (2010) 50 Cal.4th 1131, 1163.)  Generally, a good cause determination " ' "rests almost entirely in the discretion of the court below, and appellate tribunals will rarely interfere, and never unless it clearly appears that there has been a plain abuse of discretion." ' " (*Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1036.)

Applying these principles to this case, we consider whether the trial court abused its discretion in determining John lacked a good reason for not going forward with the presentation of his evidence on February 13, 2019.  In opposing John's request, Maria's counsel argued:  "We've been waiting now for four years to get this thing to trial.  I don't want him to come back and try to relitigate these issues when we're here for trial now." He argued against leaving unresolved issues for the future, even if they related to Maria's statute of limitations defense, and he characterized John's request as "just another disguised effort to continue the trial on these issues."

When John made his dismissal request in February 2019, his cross-complaint had been pending for over three years and eight months.  On January 31, 2019, all the evidence on Maria's complaint had been presented and the trial court stated "[w]e're going to set a briefing schedule and then when we start on February 13th we will be starting with Mr. Wash' Cross-Complaint against Ms. Banda."  Earlier, the court had continued the trial from January 31, 2019, to February 13, 2019, "because of Mr. Wash's surgery and Mr. Hutchins' [medical] appointment."  The trial court stated, "that should give you enough time."  No one objected.

Based on the amount of time the cross-complaint had been pending, the continuance after the evidence on the complaint had been concluded, the length of the trial, the overlap in the evidence presented on the complaint and the evidence relevant to

58.

the cross-complaint, and other factors, we conclude it does not " ' "clearly appear[] that there has been a plain abuse of discretion." ' " (*Katz v. Campbell Union High School Dist.*, *supra*, 144 Cal.App.4th at p. 1036.)  As a result, we conclude the trial court properly dismissed the cross-complaint with prejudice.

## DISPOSITION

The amended judgment is modified such that the amount of damages awarded in paragraph B.3. on page 3 is $11,255, not $12,550.  As so modified, the amended judgment is affirmed.  Maria is the prevailing party and shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)–(2).)

FRANSON, Acting P. J.

WE CONCUR:

DESANTOS, J.

ELLISON, J.[*]

---

[*] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.